IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

**VLADIMIR PEREZ,**

**Plaintiff,**

       **v.**

**HORIZON LINES, INC., et al.,**          Civil No. 11-2083 (GAG)

 **Defendants.**

## OPINION AND ORDER

Vladimir Perez ("Plaintiff") brought claims against Horizon Lines, Inc. ("Horizon") and Grace Acevedo ("Acevedo") in her personal and official capacities as Horizon's Human Resources Manager (collectively "Defendants"). Plaintiff alleges sexual harassment and gender discrimination in violation of Title VII, 42 U.S.C. § 2000 *et seq.* and other violations of various Puerto Rico laws. (See Docket No. 4.) Defendants moved to summarily dismiss the claims. (Docket No. 29.) Plaintiff opposed, Defendants replied, and Plaintiff sur-replied. (Docket Nos. 35, 40, & 47.) For the following reasons, the court **GRANTS** Defendants' motion for summary judgment at Docket No. 29.

### I.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson

**Civil No. 11-2083 (GAG)**                    2

v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  "The movant must aver an absence of evidence to support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences.  Id. at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.  Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

**II.    Factual and Procedural Background**

Plaintiff worked for Horizon from 1998 to 2010 when he was terminated from his position of Senior Yard Manager.  Plaintiff supervised two managers, eight supervisors, and more than twenty union employees.  He participated in disciplinary actions, but not decision-making, concerning his employees.  He oversaw Horizon's budget, provided customer service, and developed personnel. (See Docket Nos. 29-1 ¶¶ 1-4; 35-1 at 1-2.)

Plaintiff received a copy of Horizon's policy against discrimination, harassment, and retaliation, which prohibits unwelcome physical, verbal, or visual conduct that creates a hostile or

**Civil No. 11-2083 (GAG)**                                    3

offensive environment (the "Code of Business Conduct" or "Code").  Proscribed behavior includes

obscene gestures and visual conduct based on sex for the purpose of interfering with an individual's

professional responsibilities.  Plaintiff participated in Horizon's seminars detailing the Code of

Business Conduct, which includes a supervisory duty to report severe or pervasive behavior.

Unrelated to the events surrounding this case, Plaintiff was admonished and suspended on several

occasions for violating Horizon's Code of Business Conduct.  He explains, and Horizon agrees, that

Horizon imposed none of these sanctions for sexual harassment.  Plaintiff also received bonuses and

exemplary performance reviews when the events surrounding this case transpired. (See Docket Nos.

29-1 ¶¶ 5-6; 35-1 at 2-4, 12-14, 16-17.)

Acevedo, Horizon's Human Resources Manager, received a complaint "regarding some

photos of [Plaintiff] showing his genitals at work."  (Docket No. 29-1 ¶ 7.)  Two photos were the

focus of the complaint: one of Plaintiff's face, and, separately, a man's torso and genitalia.  Plaintiff

contends the genitalia belongs to another employee and that former Horizon employee Reinaldo[1]

Vazquez ("Vazquez"), Acevedo's son, altered the photographs and sent them to his mother to justify

Plaintiff's termination.  (See Docket Nos. 29-1 ¶ 7, 9; 35-1 at 4-5.)  Acevedo contacted Horizon's

Vice President of Human Resources, Mark Blankenship ("Blankenship"), who authorized Acevedo

to proceed with an investigation.  On November 5, 2010, Acevedo met with Plaintiff and Horizon's

General Manager, Jacob Wegrzyn ("Wegrzyn"), during which he claims the interrogators refused

to inform him of the specific instances of inappropriate conduct or Code provisions violated.

Plaintiff, under Acevedo's directive, was escorted off the premises by a Horizon security guard and

---

[1] Vazquez's first name is spelled "Reinaldo" and "Reynaldo" in the various motions, oppositions, and replies thereto.  Horizon states that Vazquez placed a centerfold picture of a Horizon employee's daughter in the men's bathroom and was forced to resign for violating the Code of Business Conduct before Plaintiff's ultimate termination.  Plaintiff claims no investigation occurred; rather, Vazquez simply resigned.  (Docket Nos. 29-1 ¶ 15; 35-1 at 11, 19.)  Defendants cite Vazquez's resignation to refute Plaintiff's allegation that no other managers or employees who engaged in sexually inappropriate behavior were disciplined or had complaints lodged against them. (See Docket No. 35-1 at 19-20.)

**Civil No. 11-2083 (GAG)**                     4

went on administrative leave during the investigation. (See Docket Nos. 29-1 ¶ 8; 35-1 at 5-6, 10-11, 27.)

Plaintiff avers that Blankenship originally assigned Port Manager Richard Rodriguez ("Rodriguez") to investigate the photographs and that he concluded they were taken in 2006 or 2007. Plaintiff claims that Acevedo reopened the investigation and neglected to tell Blankenship of the photographs' age. (See Docket No. 35-1 at 5-6.) Rodriguez confirms that Blankenship assigned him to investigate, he ultimately determined that the photograph was between two and five years old, and he reported his findings to Blankenship. (See Docket No. 35-16 at 16-19.) According to Rodriguez, Blankenship told him he thought the investigation would go no further, but "the problem [in Horizon's Puerto Rico office] need[ed] to be taken care of." (See Docket No. 35-17 at 2-3.) Acevedo subsequently informed Rodriguez that the investigation would proceed despite Rodriguez's recollection of his conversation with Blankenship. (See Docket No. 35-1 at 25.)

After taking over the investigation, Acevedo interviewed various employees during the investigation, including Victor Ortega ("Ortega"), Rafael Astacio ("Astacio"), and Batista. Ortega, whom Plaintiff supervised, stated that Horizon employees, including Plaintiff, "frequently made jokes that were sexual in nature and would also show pornographic photos and videos. Sometimes the photos and videos were shown on [Plaintiff's computer]." (See Docket Nos. 29-1 ¶¶ 10-11; 35-1 at 9; see also Docket No. 35-1 at 26-27.) Ortega claims he photographed Plaintiff's genitals.[2] Plaintiff denies this allegation and asserts that Ortega's genitalia is pictured, which Batista corroborates. (Docket Nos. 29-1 ¶ 11; 35-1 at 8-9.) Astacio avers that Plaintiff "pulled out his" genitalia in the office in front of him twice, which Plaintiff denies. (See Docket Nos. 29-1 ¶ 12; 35-1

---

[2] Ortega claims he never showed the photograph to anyone before meeting with Acevedo in November 2010, nor did he download it on any technology "of his property." (See Docket Nos. 35-1 at 21; 40-1 at 38.) Instead, he claims that Vazquez took his cell phone and downloaded the photograph because Vazquez "was very smart with cell phones," and he never gave his phone to Vazquez to take home. (Docket No. 35-1 at 21-22.)

**Civil No. 11-2083 (GAG)**                    5

at 12.)   Batista stated that Plaintiff "was the center of attention" during sexual horseplay, he

constantly used foul language, referred to his employees as "cocksuckers" and "motherfuckers,"

"rub[bed] his penis against other employees' buttocks, grab[bed] their genitals and brag[ged] about

his sexual relationships with women."   (Docket No. 29-1 ¶ 13.)  Plaintiff "denies as stated and

qualifies" this statement, but fails to refute these specific allegations, replying only that everyone

participated in the horseplay and that Acevedo knew about it.  (Docket No. 35-1 at 9-10.)  Indeed,

Plaintiff states that he used foul language and made sexual comments at work.  (See Docket No. 29-

14 at 11-12.)

On November 16, 2010, Blankenship sent Plaintiff a termination letter for violating the Code

of Business Conduct without citing a particular provision of the Code.  (Docket Nos. 29-1 ¶ 14; 35-1

at 10-11.)  Although he testified that no sexual harassment complaints were lodged against Plaintiff,

Blankenship states he relied on Acevedo's investigation, consulted with a compliance committee,

and asked Acevedo if she agreed with the decision to terminate Plaintiff.  (Docket No. 35-1 at 16,

19.)   Acevedo concluded the photograph depicted Plaintiff because of Ortega's testimony and

Plaintiff's behavioral history, as discussed by other managers and employees whom she investigated.

(See Docket Nos. 35-1 at 20; 40-1 at 36-37.)

Horizon claims it initially learned of its employees' inappropriate conduct during its

investigation of Plaintiff because no one had filed a complaint with the Human Resources

Department.  Plaintiff vehemently refutes this proffer, stating that Acevedo and several managers

knew of the atmosphere for years.  (Docket Nos. 29-1 ¶ 16; 35-1 at 11, 20.)  Acevedo's deposition

testimony does not imply that she knew of the conduct, but that various managers and employees

were aware of the behavior for years.  (Docket No. 35-8 at 15.)

On December 21, 2010, Plaintiff's attorney sent Horizon a letter contesting Plaintiff's

termination and alleging, for the first time, that Acevedo sexually harassed Plaintiff.  (Docket No.

29-1 ¶ 17.)  Plaintiff states that he neglected to complain about Acevedo's harassment because he

feared reprisal.  Acevedo purportedly told Plaintiff that Blankenship "[ate] out of her hands" and that

**Civil No. 11-2083 (GAG)**                               6

Plaintiff "had to be under" Acevedo's "protection."  Furthermore, Horizon's Puerto Rico complaint structure was futile because all complaints concerning Puerto Rico employees, including those originating with Horizon's world-wide complaint hotline, were referred back to Acevedo.  (Docket No. 35-1 at 12.)

The alleged incidents of harassment surround four events that occurred between Acevedo and Plaintiff from 2006 and 2010.[3]  Horizon celebrated an annual Christmas party during Plaintiff's tenure.  (Docket No. 35-1 at 30.)  In 2006 and 2007, Acevedo constantly insisted on dancing with Plaintiff.  She would "try to drag him to the dance floor with force" by "taking him by the arm and pulling him."  (Id.)  Plaintiff "always rejected her requests" and "felt uncomfortable by her constant advances."  (Id.)

The second instance occurred when Horizon employees celebrated a company softball team victory at a local bar in 2008 or 2009.  (See Docket No. 35-23 at 4.)  After several hours elapsed, Plaintiff decided to leave and searched for his keys for between one-half hour and an hour.  (See Docket No. 35-1 at 31.)  Following Plaintiff's futile search, Acevedo remarked, "I have them, and if you want the keys you have to come with me to my home because you are not going to yours."  (Id.)  Plaintiff declined, stating he intended to go home.  (See Docket No. 35-1 at 31.)  Acevedo responded by hiding the keys in her jeans and making Plaintiff wait one hour before returning them.[4]

---

[3] Plaintiff claims that other instances of sexual harassment occurred in a statement filed subsequent to the close of discovery, which directly contradicts his deposition testimony, during which he stated that these four events comprise the comprehensive history of Acevedo's sexual harassment.  (See Docket Nos. 29-4 at 19-20; 35-5 at 2.)  Plaintiff's supplement includes only benign instances of interaction that the court rejects outright for contributing to any ostensible severely or pervasively offensive behavior or atmosphere.  Plaintiff claims Acevedo invited him to lunch off of Horizon's premises and, during Halloween, dressed in a witch costume and told him, "Here is your little witch and this is your candy," without providing any context.  (Docket No. 35-5 at 2.)

[4] Acevedo contests the truthfulness of Plaintiff's recollection.  She admits attending the celebration but denies that the incident with the keys occurred.  (Docket Nos. 35-1 at 31; 40-1 at 53-54.)

**Civil No. 11-2083 (GAG)**                    7

(Id.)  One of Plaintiff's colleagues testified that there were probably jokes made at work about the incident, but the witness "doesn't remember" exactly what they were or what type of jokes were made.  (Docket No. 65-7 at 11-12.)  Plaintiff testified that his colleagues joked around with him about it.  (See Docket No. 35-4 at 18-19.)

Third, Acevedo called Plaintiff to her office one early morning around 7:00 a.m. in December 2009.  (See Docket No. 35-1 at 32.)  Plaintiff thought the meeting was work-related.  (Id.)  When Plaintiff arrived, Defendant closed the door and told him to sit down.  She removed all of the objects from her desk and placed a straw table cover over it.  She then stated, "I am not supposed to do this because if they catch me they'll fire me, but my saints ask me to do this for you."  She placed a "kind of chalk" above the straw table cover, revealed "some sea shells," and threw them on the table.  She then grabbed Plaintiff's hands and "started to touch him and grab him in a sexual and excessive way, stroking his arms and hands, caressing and grabbing his hands."  (Id.)  Acevedo claims she engaged in this behavior because Plaintiff requested advice from her and denies inappropriately touching Plaintiff, responding that any touching that occurred during the ritual was incidental.  (See Docket No.40-1 at 55.)  Plaintiff describes this as an "undesirable and unpleasant" situation, while Defendant replies that Plaintiff could not have found it unpleasant because he made sexual jokes at work, showed pornographic videos at work, referred to colleagues and employees as "cocksuckers" and "motherfuckers," rubbed his genitalia against other employees and grabbed their genitals, and bragged about sexual relationships.  (See Docket Nos. 35-1 at 32; 40-1 at 55-56.)

Lastly, Plaintiff claims Acevedo harassed him by asking him to bring her cornbread and cheese pastries "almost weekly" in 2010.  (Docket Nos. 35-1 at 33; 35-3 at 8-9.)  Plaintiff states that Acevedo required him to bring them personally and "hot."  (Id.)  Plaintiff interpreted this to mean that Acevedo wanted to have sex with him, particularly because their offices were in different locations.  (Id.)  Plaintiff neither picked up nor delivered the baked goods to Acevedo; rather, he sent another employee.  (Id.)  Plaintiff considered the cornbread incidents harassment because they were "not to [his] liking.  They were totally incorrect. [He] felt offended."  (Docket No. 35-4 at 16-18.)

**Civil No. 11-2083 (GAG)**                    8

Plaintiff also testified that using employees for personal errands was normal "to a certain degree" at Horizon until November 2008, but clarifies that Acevedo had the power to manipulate Blankenship to continue this practice.  (See Docket No. 35-3 at 3, 10.)

On February 15, 2011, Plaintiff filed a charge for sexual harassment with Puerto Rico's Anti-Discrimination Unit and the EEOC, receiving a right-to-sue letter on September 20, 2011.  (Docket Nos. 29-1 ¶ 18; 35-1 at 12.)

**III.    Discussion**

This case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, which prohibits discrimination because of sex.  "Title VII of the Civil Rights Act of 1964 provides, in relevant part, that '[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)). "[T]he phrase 'term, conditions, or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with [sexual discrimination] . . . ." Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971). In addition to gender discrimination, "sexual harassment is a form of sex discrimination, the Supreme Court tells us- by committing or tolerating sexual harassment against an employee, an employer has effectively altered the terms or conditions of the victim's job." Medina Rivera v. MVM, Inc., 713 F.3d 132, 136 (1st Cir. 2013); O'Rourke v. City of Providence, 233 F.3d 713, 729 (1st Cir. 2001).

A.    Sexual Harassment[5]

_____

[5] "There is no individual liability under Title VII." Fantini v. Salem State Coll., 557 F.3d 22, 31 (1st Cir. 2009).  Horizon is thus the only Defendant against whom relief may be granted.

**Civil No. 11-2083 (GAG)**                    9

Plaintiff alleges a hostile work environment and *quid pro quo* sexual harassment.  "In this form of harassment, an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment."  Valentin-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (internal citations omitted) (internal quotation marks omitted).  Before the court addresses the merits of Plaintiff's argument, Defendant raises a question of timeliness.  The court thus discerns whether Plaintiff's claims are time-barred.

> **1.      Timeliness**

Under 42 U.S.C. § 2000e-5(e)(1), a plaintiff must file an administrative charge with the EEOC within 180 or 300 days after the alleged unlawful employment practice occurred.  Puerto Rico is a deferral jurisdiction, so the administrative charge must be filed within 300 days of the alleged unlawful conduct.  Johnson v. Univ. of P.R., 714 F.3d 48, 53 (1st Cir. 2013) (citing Frederique-Alexandre v. Dep't. of Natural & Envt'l. Res. of P.R., 478 F.3d 433, 437 (1st Cir. 2007)).

> Under the continuing violation doctrine, a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period.  However, it is now well established that the doctrine does not apply to discrete acts of alleged discrimination that occur on a particular day, but only to discriminatory conduct that takes place over a series of days or perhaps years.  The classic example of a continuing violation is a hostile work environment, which is composed of a series of separate acts that collectively constitute one unlawful employment practice.  The continuing violation doctrine applies in that setting because hostile work environment claims by their very nature involve repeated conduct, and a single act of harassment may not be actionable on its own.  Thus, component acts of a hostile work environment claim that occur outside the filing period may be considered for purposes of determining liability.

Tobin v. Liberty Mut. Insur. Co., 553 F.3d 121, 130 (1st Cir. 2009) (internal citations omitted) (internal quotation marks omitted).  "For the continuing violation doctrine to apply, [a plaintiff] needs to establish that a discriminatory anchoring act occurred within the limitations period.  To qualify as an anchoring act, the discriminatory act must be substantially related to the earlier

1    **Civil No. 11-2083 (GAG)**                    10

2  incidents of abuse." <u>Lockridge v. Univ. of Me. Sys.</u>, 597 F.3d 464, 474 (1st Cir. 2010) (internal

3  citations omitted). "Title VII . . . does not separate individual acts that are part of the hostile work

4  environment claim from the whole for purposes of timely filing and liability;" rather, "the employee

5  need only file a charge within [300] days of any act that is part of the hostile work environment."

6  <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 18 (1st Cir. 2002) (quoting <u>Nat'l R.R. Passenger Corp.

7  v. Morgan</u>, 536 U.S. 101, 117-18 (2002). "Common sense teaches that a plaintiff cannot resuscitate

8  time-barred acts, said to be discriminatory by the simple expedient of linking them to . . . non-

9  discriminatory, non-time barred act[s]." <u>Lawton v. State Mut. Life Assur. Co. of Am.</u>, 101 F.3d 218,

10  222 (1st Cir. 1996).

11      Plaintiff filed an EEOC complaint on February 15, 2011, which means that any event

12  predating April 21, 2010 is time-barred. The only allegation of harassment that occurred during this

13  window of time was Acevedo's requests for personal delivery of hot cornbread and cheese pastries.

14  The court must, therefore, determine whether the cornbread incident was substantially related to the

15  hostile work environment.

16              **2.    Hostile Work Environment**[6]

17      The elements of a hostile work environment claim are as follows: 1) the plaintiff belongs to

18  a protected group; 2) he was subject to unwelcome sexual harassment; 3) the harassment was based

19  on sex; 4) the harassment was sufficiently severe or pervasive to alter the conditions of employment

20  and create a discriminatorily-abusive work environment; 5) the complained-of conduct was both

21  objectively and subjectively offensive, and; 6) there is a basis for employer liability.  <u>See Medina-

22  Rivera</u>, 713 F.3d at 137 n.2 (citations omitted). The court assumes without deciding that, at the very

23  least, the incident with the shells was severe or pervasive and considers the cornbread issue in light

24  of all three alleged incidents of sexual harassment.

25      Issues persist as to prongs (4) and (5). Plaintiff satisfies prongs (1)-(3), and employer liability

26  _____

27      [6] The Supreme Court has noted the "limited utility" in distinguishing between *quid pro quo*

28  and hostile work environment claims. <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 751 (1998).

**Civil No. 11-2083 (GAG)**                    11

exists because a question of fact remains concerning Acevedo's supervisory status.  At the very least, Acevedo's role as chief investigator and counselor to Blankenship placed her in a position to effect a tangible employment action.  Finding no employer liability at this stage would offend <u>Vance</u>.  <u>See</u> <u>Vance v. Ball State Univ.</u>, No. 11-556, slip op. at 1-2 (2013).  Indeed, Horizon empowered Acevedo to investigate Plaintiff, recommend a decision, and provide input on the final employment action. <u>Id</u>.  Thus, prong (6) is satisfied for summary judgment purposes and the court discusses in tandem the subjective and objective severity and pervasiveness of Acevedo's conduct.

"The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>Oncale</u>, 523 U.S. at 81 (quoting <u>Harris</u>, 510 U.S. at 23).  "These circumstances include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance, but are by no means limited to them, and no single factor is required." <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 48 (1st Cir. 2008).  The effect of the conduct on the employee's psychological well-being is also relevant. <u>Che v. Mass. Bay Transp. Auth.</u>, 342 F.3d 31, 40 (1st Cir. 2003).

"Prior cases in which we have concluded that a reasonable juror could find that the work environment was objectively hostile do not establish a baseline that subsequent plaintiffs must reach in order to prevail." <u>Billings</u>, 515 F.3d at 49 (quoting <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 606 (2d Cir. 2006)).  "It is the jury's job to 'weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment. . . [and] [t]he court's role in evaluating such claims is to 'police the outer bounds.'" <u>Vera v. McHugh</u>, 622 F.3d 17, 26-27 (1st Cir. 2010) (quoting <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 19 (1st Cir. 2002)).

The issue here is whether Acevedo contributed to a hostile work environment when she requested an employee to diverge from the scope of employment to personally deliver hot cornbread "almost weekly" for an extended period of time, subsequent to other instances of sexual harassment,

**Civil No. 11-2083 (GAG)**                    12

when Plaintiff believed Acevedo used the requests to pursue him sexually.  When a supervisor

directs an employee to procure cornbread once a week for an extended period of time and the

employee presents evidence of prior sexual harassment, the command itself may constitute

harassment.  See O'Rourke, 235 F.3d at 730 ("[I]ncidents of nonsexual conduct . . . can in context

contribute to a hostile work environment.").

> Standing alone . . . [a] supervisor's demanding -- even in the
> presence of others -- that the subordinate employee perform
> demeaning personal tasks for the supervisor, is [in]sufficient to
> constitute sexual harassment. When viewed in *pari materia* with
> multiple incidents of egregious sexual misconduct alleged, however,
> such behavior can serve to bolster a conclusion of sexual harassment,
> even severe or pervasive harassment.

Casiano v. AT&T Corp., 213 F.3d 278, 285 (5th Cir. 2000).  Plaintiff generally alleges that Acevedo

used the cornbread delivery command as an avenue to sexually pursue Plaintiff.  The court is unclear

as to whether Plaintiff believes the command itself was harassing or he meant to use "hot cornbread"

as a euphemism.  Although Plaintiff fails to articulate that "hot cornbread" is a euphemism for

something derogatory or sexual, the court, in an abundance of caution, addresses both possibilities.

In Lee-Crespo v. Schering-Plough Del Caribe, Inc., the First Circuit found that "the

complained of conduct was episodic, but not so frequent as to become pervasive; was never severe;

was never physically threatening (though occasionally discomforting or mildly humiliating); and

significantly, was never . . . an impediment to [the plaintiff's] work performance." 354 F.3d 34, 46

(1st Cir. 2003).  Plaintiff complains that Acevedo asked him to bring her hot cornbread

approximately once a week, which is unquestionably more than "episodic."  However, Plaintiff

admits that supervisors, including himself, used subordinates for personal errands.  Even when the

practice stopped in 2008, according to Plaintiff, Acevedo had Blankenship "eating out of his hands"

and could manipulate his orders, including the order to stop using subordinates for personal errands.

The act of procuring the cornbread was not harassing, as requiring an employee to perform

undesirable tasks, by itself, does not rise to the requisite severity or pervasiveness, particularly when

Plaintiff knew superiors would sometimes require employees to perform tasks outside the scope of

**Civil No. 11-2083 (GAG)**                                                13

their employment.  See e.g., Tuggle v. Mangan, 348 F.3d 714,721-22 (8th Cir. 2003); Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 555 (5th Cir. 1997); Montandon v. Farmland Indus. Inc., 116 F.3d 355, 359 (8th Cir. 1997); Kennedy v. General Motors Corp., 226 F. Supp. 2d 1257, 1266 (D. Kan. 2002); (see also Docket No. 35-3 at 9 ("Acevedo can break the rules, she is not penalized" and "she has a lot of power at Horizon.").

Plaintiff, furthermore, never personally purchased or delivered the cornbread; rather, he assigned an employee to do so.  Plaintiff fails to allege that the request imposed a physical hardship, impacted his psychological well-being beyond stating that he felt offended, or impeded his work performance.  See Lee-Crespo, 354 F.3d at 46; see also Che, 342 F.3d at 40.  Indeed, Plaintiff received sterling performance reviews throughout his tenure until his termination.  Each of these factors militates against finding that Acevedo's behavior was severe or pervasive.  Plaintiff felt that, by requiring him to personally deliver "hot cornbread," Acevedo sexually pursued him.  But, aside from the past harassment, Plaintiff does nothing to distinguish this harassment from an employer requiring a subordinate to bring her a daily cup of coffee or pick up the day's newspaper. Because receiving a weekly phone call that results in instructing an employee to procure and deliver cornbread is not severe or objectively offensive conduct, even when considered in tandem with prior acts of harassment, the only remaining question is whether the demand itself constitutes harassment.

Plainly, the court is in no position to definitively rule whether hot cornbread is a euphemism for the female anatomy or sexual intercourse.  Neither the court nor a jury will resolve that question in this case, however, because Plaintiff's claim fails by his own hand.

Plaintiff wrote:

> During my last year with the company, Ms. Acevedo called me to my extension at least once a week to ask me to buy her corn bread, specifically from La Ceiba B[a]kery because she loved the corn bread from there.  She told me[,] "[Y]ou never know when you are going to need a favor[.]"  I felt intimated and obligated, especially after she repeatedly told me that "she had Mr. Mark Blankenship, VP of Human Resources, eating from hand[.]"  She also requested me specifically to send union member employee "Eleuterio Lopez" during working hours to fulfill her requests.

**Civil No. 11-2083 (GAG)**                    14

(Docket No. 35-23 at 3-4.)  According to Plaintiff, Acevedo clearly wanted cornbread, and she did not even request Plaintiff to pick it up or deliver it himself.  No question of fact thus exists as to whether Acevedo pursued Plaintiff sexually through her requests for cornbread, even when considered in light of three previous acts of sexual harassment.  Nothing ties these requests to the time-barred, ostensibly meritorious sexual harassment claims.  Indeed, Plaintiff replied "no" when asked whether the cornbread requests constituted sexual invitations.  (Docket No. 29-14 at 15.)

Lastly, the court questions Plaintiff's subjective discomfort with Acevedo's request.  Plaintiff acted extremely inappropriately during his tenure with Horizon.  He admits that he engaged in sexual horseplay and used foul language in front of superiors.  His colleagues claim they watched pornographic videos with him, he grabbed colleagues' genitals, and he rubbed his genitalia against others' buttocks.  He also called people "cocksuckers" and "motherfuckers."  He fails to directly refute many of these allegations.  Plaintiff's only responses to some of these allegations are: 1) that was the general atmosphere in his particular branch of Horizon, and; 2) Acevedo was a supervisor and a female, so her statements were more inappropriate than those around his office.  His rationale falters because, first, "everyone was doing it, so why should I be the one to get in trouble?"does not change that fact that he engaged in the behavior.  Secondly, Batista, *his direct supervisor*, gave uncontradicted testimony that Plaintiff "was the center of attention" during sexual horseplay, he constantly used foul language, referred to his employees as "cocksuckers" and "motherfuckers," "rub[bed] his penis against other employees' buttocks, grab[bed] their genitals and brag[ged] about his sexual relationships with women."  (Docket No. 29-1 ¶ 13.)

Assuming without deciding that Acevedo sexually harassed Plaintiff, the court concludes that she nonetheless had substantial grounds for thinking that Plaintiff was not only receptive to the invitation, but that he encouraged it.  To belabor the point, Plaintiff rubbed his genitals against Horizon employees and rubbed others' genitals, too.  If Acevedo was well aware of the atmosphere in Plaintiff's office, as he claims, she had good reason to think Plaintiff would welcome her advances, or at least not take offense to them.  See Romaniszak-Sanchez v. Int'l. Union of Operating

**Civil No. 11-2083 (GAG)**                    15

Engineers, 121 F. App'x. 140 145-46 (7th Cir. 2005) ("[W]hile . . . likely that the comments . . . were not "welcome," neither were they so offensive as to be obviously harassing.  This type of sexual banter was common in the office . . . [and the plaintiff's] conduct [as a willing participant] indicates that the comments were not . . . unwelcome . . . approaches [creating] a hostile sexual environment.")  Plaintiff's hostile work environment claim is thus dismissed.

### 3.    *Quid Pro Quo* Harassment

A *prima facie* case of *quid pro quo* harassment has five parts: 1) the employee is a member of a protected group; 2) the advances were unwelcome; 3) the harassment was sexually motivated; 4) the employee's reaction to the supervisors's advances affected a tangible aspect of his employment, and; 5) employer liability exists.  See Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 783  (1st Cir. 1990).  Although questions persist as to the sexual nature of Acevedo's request for cornbread, the court assumes that Plaintiff satisfies all five prongs, except prong four.  The fourth prong requires that "the acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment."   Id. at 784 (quoting Jones v. Flagship Int'l., 793 F.2d 714, 722 (5th Cir. 1986)).  The question is thus whether Acevedo expressly or implicitly attached a threat of termination to the cornbread command.

In the light most favorable to Plaintiff, Acevedo pursued Plaintiff sexually, Plaintiff thrice rebuked her efforts, Acevedo told him he could use a friend like her or protection because Blankenship ate out of her hand, and Plaintiff was subsequently terminated.  Acevedo's statement concerning the need for a friend and her relationship with Blankenship is the only evidence of a condition attached to the detrimental employment action.  This vague statement aligns too closely with the attached condition in Gerald and thus creates no trial-worthy issue.  Gerald v. Univ. of P.R., 707 F.3d 7, 21 (1st Cir. 2013).

In Gerald, although the First Circuit vacated the district court's grant of summary judgment of Plaintiff's Title VII claim for *quid pro quo* harassment, it directly implied that the employer's statements, standing alone after successful and unsuccessful sexual pursuits, were too vague to create

**Civil No. 11-2083 (GAG)**                    16

a trial-worthy issue.  The court opined:

> Specifically, in one email, [the employer] said: 'Just relax. [You] only live once.'  In another, he tells [the plaintiff]: 'Offer still on table.'  Similarly ambiguous language is an email exchange the day after the proposition in which [the employer] writes: 'Sorry, I have to draw the line somewhere.  Hope that you will be able to eat your own words without too much ketchup.'  As with the other emails, it is not entirely clear what [the employer] is referring to - [the plaintiff's] rejection . . . or something else.  Construing the evidence and reasonable inferences in [the plaintiff's] favor . . . it is plausible to read these emails to mean what she says they do, but we acknowledge we are getting close to speculative territory.  Were this all [the plaintiff] had, it would likely not be enough to create a trial-worthy issue, but [the plaintiff] also presented a good amount of evidence rebutting the University's contention that she [had an adverse employment action taken against her] for job related reasons, as opposed to for rejecting [her employer.]

Id. at 21.  Gerald instructs the court because the ambiguity in the employer's statements compares to the ambiguity in Plaintiff's recitation of Acevedo's admonishment, specifically, that he would need a friend or a favor from her because the company vice president for human resources ate out of her hand.  Furthermore, unlike in Gerald, Plaintiff fails to proffer evidence tying his refusal to engage Acevedo with his termination or legitimately discredit Horizon's decision to terminate him.  In contrast, Plaintiff compiled numerous infractions for breach of the Code of Business Conduct and engaged in a pattern of absurd behavior that completely justifies termination.  This insufficiency argues against Plaintiff.  See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 53 (1st Cir. 2000) ("Faced with a motion for summary judgment [in a *quid pro quo* harassment case], it was [the plaintiff's] burden to establish that there existed evidence creating a trial-worthy claim . . . .").

Two factors counsel hesitation before granting summary judgment: 1) Acevedo was Plaintiff's superior, and; 2) she previously sexually harassed him.  But Gerald again assuages the court's concerns.  The aggressor in Gerald was also a superior who took a tangible employment action against the victim, and the First Circuit considered[7] the victim's prior rebuff of the aggressor's

---

[7]   In Gerald, the First Circuit noted the victim's termination as bearing close temporal proximity to her rejection of her employer's sexual advances.  The court opined, "There is no need

**Civil No. 11-2083 (GAG)**                    17

pursuit, e.g., grabbing her breast only to be rejected, in crafting the above passage.  Id. at 20-21.

Furthermore, the court found triable issues over whether a hostile work environment existed,

implying that a *quid pro quo* claim could fail even if a hostile work environment claim persists.  Id.

at 18-19.  The court is not faced with such a difficult question here.  When asked whether he was

terminated for failing to bring Acevedo cornbread, Plaintiff replied, "It doesn't talk about that

specifically there." (Docket No. 35-4 at 15.)  Considering the totality of the circumstances, Plaintiff

fails to create genuine issues of material fact concerning *quid pro quo* sexual harassment.

     B.    <u>Gender Discrimination</u>

     Plaintiff also claims Defendant violated Title VII through gender discrimination.  This

claim fails outright because Plaintiff offers no evidence, whatsoever, of gender discrimination.  <u>See</u>

<u>Rivas Rosado v. Radio Shack, Inc.</u>, 312 F.3d 532, 534 (1st Cir. 2002) (Lynch, J.) ("The mere fact

that the decision makers were [of the opposite sex] does not alone, absent other evidence, create an

inference that they engaged in gender discrimination.").  When an employee is regularly promoted

and rewarded before the legitimate reasons for termination occur, as is the case here, an inference

against gender discrimination exists.  Id.  Furthermore, "[t]here were no statements or behaviors by

[the supervisors] involved in terminating [Plaintiff] from which an inference of discrimination could

be drawn."  Id.

     Plaintiff responds by stating that his termination was based on the erroneous finding that the

photographs of himself and the male genitalia were the product of Acevedo's conspiracy against him

and that other employees who also engaged in similar, inappropriate behavior, including Acevedo,

were never reprimanded.  Plaintiff's "attacks on the details of [Horizon's] findings misconstrue Title

VII, which does not ensure against inaccuracy by an employer, only against gender-based

---

to make the leap [to considering temporal proximity in *quid pro quo* harassment cases] because
Gerald" presented enough evidence to withstand summary judgment.  707 F.3d at 24 n.9.  In this
case, the adverse employment action occurred one to four years after any of the alleged physical
actions of sexual harassment and months after the initial request for cornbread.  Because nothing ties
Plaintiff's termination to these actions, the temporal proximity, as in <u>Gerald</u>, also bears noting.

**Civil No. 11-2083 (GAG)**                                18

discrimination." <u>Id.</u> at 535.  The relevant inquiry is whether Acevedo drummed up the allegations because of Plaintiff's gender.  Plaintiff avers no evidence to this affect.  <u>See id.</u> (quoting <u>Dominguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 430-31 (1st Cir. 2000) ("At the summary judgment phase . . . the focus should be on the ultimate issue: whether, viewing the aggregate package of proof . . . and taking all inferences in the plaintiff's favor . . . a genuine issue of fact [exists] as to whether the termination of the plaintiff's employment was motivated by [gender] discrimination.")).

    C.    <u>State Law Claims</u>

        **1.**    **Law 17 and Law 100**

    Plaintiff also raises claims under Law 17 and Law 100, Puerto Rico's analogues to Title VII's sexual harassment and gender discrimination laws, respectively.  The First Circuit has determined that Title VII's, Law 17's, and Law 100's prohibitions against gender discrimination and sexual harassment "serve virtually the same purposes and outlaw essentially identical behavior."[8]  <u>Gerald</u>, 707 F.3d at 28; <u>see also</u> <u>Perez-Cordero v. Wal-Mart P.R., Inc.</u>, 656 F.3d 19, 25 n.10 (1st Cir. 2011) (finding such substantial overlap between the laws that failure to brief the distinction merits applying the Title VII ruling to the state claim).  The court agrees.  Plaintiff, citing cases supporting the proposition that Law 17 and Law 100 differ from Title VII, states that Law 17 and Law 100 pose a lower burden on plaintiffs.  However, Plaintiff fails to meaningfully elaborate on how the difference impacts this case and why Puerto Rico law entitles him to pass the summary judgment threshold.  The court bears no duty to fill in the blanks.  <u>U.S. v. Zannino</u>, 895 F.2d 1, 17 (1990).  Plaintiff's Law 17 and Law 100 claims are **DISMISSED**.

        **2.**    **Law 80**

---

    [8]  Puerto Rico's one-year limitations period for filing an ADU or EEOC claim after the adverse employment action occurs does not impact this outcome because the most recent incident prior to the cornbread requests was the shells reading in December 2009.  <u>See</u> <u>Gerald</u>, 707 F.3d at 28. Furthermore, although the Puerto Rico Supreme Court has interpreted Law 100 as encompassing individual employer liability, the court finds no basis for Acevedo's liability based on the reasons stated in this opinion.  <u>See</u> <u>Perez-Cordero</u>, 656 F.3d at 25 n.7.

**Civil No. 11-2083 (GAG)**                                    19

Plaintiff also brings a claim for wrongful termination under Puerto Rico's Law 80.  Law 80 creates a right of action in favor of an employee who is fired without just cause.  P.R. LAWS ANN. tit. 29, § 185a.

> Law 80, a statute of general application, applies to every employee in commerce, industry, or any other business or work place contracted without a fixed term, who is discharged from his/her employment without just cause.  Under Law 80, these employees are entitled to a form of severance pay known as a mesada, which is calculated using a formula based on the employee's salary and years of service.

Soto v. State Indus. Prods., 642 F.3d 67, 74-75 (1st Cir. 2011).  Preliminarily, Horizon argues that Plaintiff agreed to arbitrate this claim.  Plaintiff responds that, by substantively arguing that this matter must be submitted to arbitration for the first time at summary judgment, Horizon waived its prerogative to demand arbitration.  The court agrees with Plaintiff.  Horizon waited approximately one year to invoke the arbitration clause.

Plaintiff cites Jones Motor Co.v. Chauffeurs for support.

> [T]he conduct allegedly constituting waiver here simply consists of a failure to seek arbitration while acquiescing in court resolution of the dispute. These facts took place after the complaint was filed; and the question of whether they amount to waiver calls for the expertise of a judge, not an arbitrator. Moreover, to require that parties go to arbitration despite their having advanced so far in court proceedings before seeking arbitration would often be unfair, for it would effectively allow a party sensing an adverse court decision a second chance in another forum. Further, to hold that courts cannot find waiver would waste scarce judicial time and effort. Finally, it is important that judges remain free to control the course of proceedings before them and to correct any abuse of those proceedings by, for example, denying a belated motion for arbitration.

671 F.2d 38, 43 (1st Cir. 1982).  Relevant factors to consider when assessing waiver include whether the party has actually participated in the lawsuit, whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit by the time an intention to arbitrate was communicated by the defendant to the plaintiff, whether defendants had taken advantage of judicial discovery procedures not available in arbitration, and whether the other party was affected, misled, or prejudiced by the delay.  Id. at 44.  In Jones Motor, the First Circuit found

**Civil No. 11-2083 (GAG)**                        20

waiver when the defendants engaged in considerable discovery and prepared their case for summary judgment.  Id.  The court agrees with the holding in Jones Motor.

The court is intimately familiar with the entire record and all of Plaintiff's claims after reviewing the submissions, which are inextricably intertwined with Plaintiff's Law 80 claim.  The court is thus poised to decide this issue.  Furthermore, requiring Plaintiff to re-argue a case that is nearly two years old when the court already has all of the facts before it delays the administration of justice and prejudices Plaintiff.  The court refuses to play venue ping pong with Plaintiff's claim.  Despite rejecting Horizon's motion to arbitrate, the court anticipates Horizon will not protest the result.

Plaintiff's Law 80 claim fails.  Law 80 provides severance for employees terminated without just cause.  P.R. LAWS ANN. tit. 29, § 185a.  It follows a burden-shifting scheme: once an employee establishes discharge, the employer must show that it was for just cause, and the employee must rebut this showing.  Baltodano v. Merck, Sharp & Dohme (I.A.) Corp., 637 F.3d 38, 41-42 (1st Cir. 2011).  Plaintiff was discharged, Horizon justifies the discharge because Plaintiff violated the Code of Business Conduct by rubbing his genitals on other employees, using foul language, engaging in sexual horseplay, bragging about the women he slept with, grabbing others' genitals, watching pornography on his computer, and for a photograph of a male genitalia that his employer deemed was Plaintiff at work.  Although Plaintiff contests the authenticity of the photograph, identifying him as the subject in the photograph, and Acevedo's intention behind pursuing the investigation of him, the myriad other violations of general professional norms unquestionably merit termination.  Plaintiff's only response to several anecdotes or recollections of his improprieties is that this sexual environment permeated his entire office, and he should incur no greater liability than his colleagues.  Perhaps he was the first step in Horizon's efforts to clean house, or perhaps he was the only employee terminated.  Either way, his termination was justified.

Plaintiff received a copy of the Code, which prohibits unwelcome physical, verbal, or visual conduct that creates a hostile or offensive environment.  Proscribed behavior also includes obscene

**Civil No. 11-2083 (GAG)**                    21

gestures and visual conduct based on sex for the purpose of interfering with an individual's professional responsibilities.  Plaintiff participated in Horizon's seminars detailing the Code of Business Conduct.  Violating an employer's instructions and improper conduct both constitute grounds for good cause under Law 80.  See Hoyos v. Telecorp Commc'n's., Inc., 488 F.3d 1, 6 (1st Cir. 2007); Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998); Menzel v. W. Auto Supply Co., 662 F. Supp. 731, 745 (D.P.R. 1987).  Plaintiff's termination was therefore justifiable and his Law 80 claim is **DISMISSED**.

**IV.    Conclusion**

For the reasons discussed above, Defendants' motion for summary judgment at Docket No. 29 is **GRANTED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 23rd day of September, 2013.

S/ Gustavo A. Gelpí

GUSTAVO A. GELPI

United States District Judge